Filed 10/19/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>J.H.,<br><br>　　　Defendant and Appellant. | A163882<br><br>(Solano County<br>Super. Ct. No. J44716) |

　　　This is one of those rare juvenile dependency cases in which the failures on the part of the social service agency and the juvenile court to comply with the due diligence, notice and parentage inquiry requirements of the dependency statutes were so pervasive that they denied due process to the noncustodial alleged father of the child.  We reverse the order terminating parental rights, and remand for further proceedings consistent with this opinion.

1

# BACKGROUND

## I.

### *General Legal Principles*

Before turning to the facts, we provide a brief overview of the law governing the rights of a person claiming to be the parent of a dependent child.

There are three types of fathers in dependency law: presumed, biological and alleged.[1] (*In re Mia M.* (2022) 75 Cal.App.5th 792, 806 (*Mia M.*).) " 'A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled.' " (*In re Christopher L.* (2020) 56 Cal.App.5th 1172, 1184, affd. (2022) 12 Cal.5th 1063.)

Presumed parent status, which is the equivalent of a legal parent, " ' "ranks the highest." ' " (*Mia M.*, *supra,* 75 Cal.App.5th at p. 806.) It confers "all the rights afforded to parents in dependency proceedings, including standing, the appointment of counsel, and reunification services." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2022) § 2.60[2][a], p. 2-129 (Seiser & Kumli).) Presumed parentage is determined under the Uniform Parentage Act (Fam. Code, § 7600 et seq.), a statutory framework that " 'provides for conclusive and rebuttable presumptions of paternity' " on various grounds. (*In re P.A.* (2011) 198 Cal.App.4th 974, 980; see also generally Seiser & Kumli, § 2.60[2], pp. 2-129-2-149.) Under that framework, "[b]iological fatherhood does not, in and of itself, qualify a man

---

[1] We recognize that an alleged parent can be of either gender and that an alleged mother has the same rights as an alleged father. For convenience, and because this case involves the more typical situation addressed in the case law in which the alleged parent is a father, we use the male gender without meaning to exclude alleged mothers.

for presumed father status . . . ."[2]  (*M.M. v. D.V.* (2021) 66 Cal.App.5th 733, 741.)  The law in the area of presumed parentage is complex and evolving. (Seiser & Kumli, *supra*, § 2.60[2][c][iii], p. 2-143.)

Next in order of ranking is a biological father, a man "who has established his paternity but has not established his qualification as a presumed parent."  (*In re J.W.-P.* (2020) 54 Cal.App.5th 298, 301 (*JW.-P.*).) "A court may order reunification services for biological fathers if they are in the child's best interest . . . ."  (*Ibid.*)

---

[2] Without purporting to be exhaustive, we note that most of the presumptions of legal parentage arise from various circumstances involving marriage or attempted marriage (see, e.g., Fam. Code, §§ 7540, subd. (a) [conclusive presumption], 7611, subds. (b), (c).)  Legal parentage also may be established where "The presumed parent receives the child into their home and openly holds out the child as their natural child."  (*Id.*, § 7611, subd. (d).) The latter ground, although it does not require that the child actually live with a parent, does require proof of "a fully developed parental relationship with the child," judged by many factors, none specific.  (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 144-145, italics omitted.)

In addition to establishing parentage under the statutory presumptions, a man may attain legal parent status by co-executing a voluntary declaration of parentage with a child's unmarried birth mother, which must be witnessed by hospital staff, that, when filed with the Department of Child Support Services, "is equivalent to a judgment of parentage of the child and confers on the declarant all rights and duties of a parent."  (Fam. Code, § 7573, subd. (d); see also *id.*, § 7573, subd. (a)(1); *id.*, § 7571, subd. (a).)

There also are circumstances in which an unwed biological father who has been *prevented* by a child's mother from becoming a presumed father under the statutory presumptions may acquire the rights equivalent to those of a presumed parent, and whose parental rights thus may not be terminated without proof of parental unfitness (a "*Kelsey* father"). (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 821, 849-850; *W.S. v. S.T., supra,* 20 Cal.App.5th at p. 148; Seiser & Kumli, *supra*, § 2.60[3][b], pp. 2-150–2-154.)

Finally, an alleged father is a man who may be a child's father but has not yet established either presumed father status or biological paternity. (See *J.W.-P.*, *supra*, 54 Cal.App.5th at p. 301; Seiser & Kumli, *supra*, § 2.60[4], p.2-155.) "Alleged fathers have 'fewer rights' and, unlike presumed fathers, 'are not entitled to custody, reunification services, or visitation.' " (*J.W.-P.*, at p. 301.) That is the category with which we are concerned here.

"An alleged father has no rights in a dependency case other than the right to step forward and to seek to establish his paternity of the child" (Seiser & Kumli, *supra*, § 2.60[4], pp. 2-155–2-158), a right that is guaranteed through various constitutional and statutory requirements that, as we discuss more fully *post*, were violated time and again in this case.

As we will discuss, an alleged father's rights (and/or corresponding duties on the part of the state), fall into essentially four categories: (1) the right to notice of the proceedings and of certain hearings (see Welf. & Inst. Code, §§ 290.1, 290.2, 291, 294, subd. (a)(2))[3]; (2) the right to notice of their rights as an alleged father and the steps necessary to elevate their status to that of a presumed father (see § 316.2, subd. (b)); (3) the court's corresponding duty to inquire into an individual's possible parentage through various extrinsic sources apart from the individual's own self-reporting (see § 316.2, subd. (a)); and (4) if the whereabouts of an alleged father are unknown, the state's constitutional duty to exercise reasonable diligence to find him, so that he may be given proper notice of the proceedings (see *Mia M.*, *supra*, 75 Cal.App.5th at pp. 807-808). In addition, and relatedly, if an alleged father's parental rights are at stake, he may be entitled to appointed counsel on request if he cannot afford private counsel. (See § 291,

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

4

subds. (a)(2) & (d)(6)(B), (C) [statutory right]; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1407 [constitutional right].)

At bottom, an alleged father has a constitutionally protected due process right to " 'be given notice and an opportunity to appear, to assert a position, and to attempt to change [his] paternity status [citation].' " (*Mia M.*, *supra*, 75 Cal.App.5th at p. 807; accord, *In re R.A.* (2021) 61 Cal.App.5th 826, 835-836 [" 'Due process requires that a parent is entitled to notice that is reasonably calculated to apprise him or her of the dependency proceedings and afford him or her an opportunity to object' "].) J.H. was deprived of that opportunity.

## II.

### *The Initiation of This Case and the Detention Hearing*

On September 16, 2019, the Department filed a dependency petition under section 300, subdivisions (b)(1) and (g) and (j), after taking six-year-old A.H. and her two younger half-siblings into emergency protective custody and placing them in foster care. Only A.H.'s case is at issue here, and so we address her two half-siblings only as relevant.

The petition alleged that the children's mother, C.S. (mother), had allowed A.H. to have unsupervised contact with an older relative whom mother suspected of having sexually molested the child (§ 300, subd. (b)); the father of A.H.'s two half-siblings, B.M., also was aware of the possible sexual abuse, and he and mother were thereby placing the two half-siblings at risk (*id.*, subd. (j)); and A.H.'s alleged father, appellant J.H., had failed to provide care, support or supervision of the six-year-old child for more than a year and his whereabouts were unknown (§ 300, subd. (g)). Despite the allegations of J.H.'s "unknown" whereabouts, the petition listed an address for him on Galbrath Street in Sacramento. There is no information in the record about the source, currency or nature of that address. There also is no evidence the

5

Department ever served the petition on J.H. at that address. At this point, the Department had had no contact with J.H.

The detention report, filed the same date as the petition (September 16, 2019), shed further light on J.H.'s relationship to the six-year-old girl but none about his whereabouts, and very little about the Department's efforts to learn them. It stated *mother had reported that J.H. is A.H.'s father, was present for her birth, was listed on her birth certificate and had not been involved in her life for approximately a year.* Given the child's age, that statement attributed to mother implied J.H. *had* been "involved in her life" until around age five. The detention report did not disclose any prior child welfare referrals concerning J.H., but recounted a significant history of child welfare interventions for mother dating back to 2016, some of which also involved the father of the other two children, B.M. Like the petition, the detention report identified J.H. as the alleged father and referred to the Galbrath Street address for him. The Department also reported that it had "not had contact with" J.H. Although it had provided notice of the detention hearing to mother and B.M. by telephone, it had attempted unsuccessfully to reach J.H. by telephone at two different phone numbers (about which no information was provided) and had been unable to leave a message. So, it had sent an email to J.H. at an email address (about which no information was provided) requesting a return phone call.

At the detention hearing, held on September 17, 2019, mother and B.M. were present with counsel and J.H. was not present. An attorney asked whether the court was inclined to appoint her to represent J.H. The court declined to do so at that juncture, directed the Department to continue to try to contact him, and indicated that it would appoint her as his counsel if he came forward and requested to be a participant. The court made no inquiry

6

about the Department's efforts to ascertain J.H.'s whereabouts, including the significance or source of the Galbrath Street address that it listed for him or the email address the Department had used to reach out to him. The court also conducted no inquiry of mother into J.H.'s possible paternity, as required by section 316.2.

The children were ordered detained, the Department was directed to provide various services to mother and B.M. as well as supervised visitation, and the joint jurisdiction and disposition hearing was calendared for October 29, 2019.

The detention hearing findings and orders were served by the court on counsel for mother, B.M., the children and on the Department, but not on J.H.

## III.

### *Jurisdiction and Disposition*

Due to a number of continuances and other circumstances, the contested jurisdiction/disposition hearing eventually took place about eight months after the detention hearing, on May 11, 2020. In the interim, four court hearings took place, and the Department filed two amended petitions and two written reports. The record does not show J.H. was given notice of any of those proceedings (and he made no appearance), nor that during this eight-month period he was served with anything but an ICWA notice. In addition, very early on during this period, J.H. spoke by telephone with the Department; yet there is no evidence the Department did anything to ascertain his current contact information, much less to apprise him of his rights as an alleged father and of the steps necessary for him to try to elevate his status to that of a presumed parent.

7

That phone call, which was the Department's first and only contact with J.H. during the eight months that preceded the jurisdiction/disposition hearing, took place several weeks after the detention hearing, on October 8, 2019, when, according to one of the Department's addendum reports, a social worker spoke with J.H. Another social worker would later testify at the jurisdiction/disposition hearing that J.H. had "reached out to the ER [social] worker," which in context appears to refer to this telephone contact. J.H. reportedly told the social worker he had learned from mother about the allegations and the children being removed, had not been aware of any previous concerns, and visited with A.H. once or twice a month. The social worker inquired about Indian ancestry, which he denied having. There is no indication the conversation addressed any other subject, including any of the subjects encompassed by section 316.2.

Two days later, on October 10, 2019, the Department served an ICWA-030 form (Notice of Child Custody Proceedings for Indian Child) on J.H., either by first class mail (proof of service) or by certified or registered mail (certificate of mailing) to an address on "Walegra" Road[4] in Sacramento, although it also continued to list the Galbrath Drive address in Sacramento for J.H. As noted, this is the only document ever purportedly served on J.H. up to and through the contested jurisdiction/disposition hearing, and it also is one of only two documents ever purportedly served on him at all during the case. The ICWA notice stated the petition was included with the form.[5] It

---

[4] Later references to this address spell the road name as "Walerga" rather than "Walegra" but use the same zip code.

[5] The petition stated that A.H. was within the jurisdiction of the juvenile court, had been detained on September 12, 2019, and was in a shelter or foster care. It also warned that parental rights could be terminated, and that to protect them the parent had to appear in court and answer the petition.

8

also listed the date, time and location for the jurisdiction/disposition hearing regarding A.H. (then calendared for October 29, 2019), but it provided no information about the nature of the hearing and did not advise J.H. of his right to attend the hearing. Although the record contains a certified mail receipt for another recipient of the ICWA notice (the Bureau of Indian Affairs), the record contains no certified mail receipt or other information showing the ICWA form and petition were actually delivered to J.H. at either of the two addresses it listed.

After that, the Department served by mail on mother and B.M. but *not* J.H. (at any address): (1) notice of the October 29, 2019 jurisdiction/disposition hearing (on October 25, 2019) and advised both mother and B.M. they had a right to be present and to be represented by counsel if they could not afford counsel; and (2) a request (on October 28, 2019) to continue the October 29, 2019 hearing.

On October 29, 2019, mother, B.M. and their counsel appeared in the juvenile court, and the court continued the combined jurisdiction and disposition hearing to November 19, 2019. There was no mention of J.H., who was not present. B.M., who was represented by counsel, submitted a JV-505 form seeking to have his status elevated to that of A.H's presumed father.

Next, the Department served on mother and B.M. but *not* J.H. (at any address) (1) a first amended petition (filed on November 8, 2019), adding new allegations concerning mother's abuse of one of A.H.'s half-siblings which allegedly put A.H. at risk too; and, shortly after that, (2) a lengthy jurisdiction/disposition report (filed November 15, 2019) recommending, among other things, the court sustain the allegations concerning mother,

9

B.M. and J.H. and that J.H. remain an alleged father and not receive any services.

The November 15, 2019 jurisdiction/disposition report addressed, among other subjects, the Department's efforts to contact J.H. and what it had learned about him, including some information (albeit conflicting) suggesting J.H. had been more than just an absent figure in his biological daughter's life.

To begin, the Department asserted it had had limited engagement with J.H. On that subject, it reported the social worker's phone call with J.H. the prior month on October 8, and also reported that about a month later, on November 13, 2019, a different social worker had called J.H. at the phone number provided by the prior social worker, left him a message asking him to return her call and had not yet heard back. The report did not state what other efforts, if any, the Department made to find and communicate with J.H. Nor did it indicate whether the Department had requested or obtained a mailing address for J.H. during the October 8 phone call, or confirmed he was receiving mail at the Walerga Road, Sacramento address.

The November 15, 2019 report also contained some new information bearing on J.H.'s parentage but in several respects was vague. First, mother reportedly had identified J.H. as A.H.'s biological father. Second, the Department had done a database search and learned that a default judgment for child support had been entered against J.H. in December 2016. The Department reported nothing else about child support, such as whether and for how long J.H. had paid support, or whether and to what extent the Department had investigated the subject any further. Third, the Department reported that J.H. had not engaged in visitation, but also did not state whether it had offered J.H. visitation or informed him how to go about

10

visiting A.H., who had been placed in foster care. And finally, the report relayed additional, and somewhat conflicting, information about the extent of J.H.'s role in the child's life. J.H. reportedly had told the social worker he had seen A.H. in August 2019 (i.e., the month before this case was initiated) and had visited her at least once or twice this month.[6] Mother reportedly said J.H. had had "limited interaction" with A.H. for several years, was "in and out" of their lives and "does not see or talk to [A.H.]"; and that when they saw him in August 2019, it was after they ran into each other at a store. She said J.H. was not ready to be a father and had told her it was too painful for him to see A.H. The Department reported that the child herself, in a "multidisciplinary" interview, had said she has "two Daddy's, B and [J.H.]," that B. tries to keep her safe from J.H. because she lives with B. and doesn't live with J.H., but that she "misses [J.H.] every day." She reported feeling safe with mother and B.M., but when asked whether she felt safe with J.H., she said, "I don't know yet. Mommy has to think about it, so I don't know." Asked how she feels when she is with J.H., she said she felt "happy with [J.H.]." And according to what mother told the social worker, A.H. began wetting her bed three years earlier when J.H. left, and also verbally acted out with B.M. because she blamed him for J.H. leaving.

As noted, the November 15, 2019 report recommended J.H. remain an alleged father and not receive any services. The Department stated that because J.H. "had not been in consistent contact" with the Department, it was unaware of his biopsychosocial background, his parenting strengths, his needs and his views regarding disposition. The report acknowledged that

---

[6] In one place, the report says he reported visiting A.H. once or twice a month, whereas in another it said he told the social worker he visited her once or twice this month.

there were no "non-reunification" issues as to J.H. if he were elevated to presumed father status. However, it did not recommend currently placing A.H. with J.H. as her noncustodial father, because it had not been able to assess his living environment or capacity to care for A.H. and also because J.H. "previously had little interaction and relationship with [A.H.] prior to the Department's involvement," an observation at odds with the child's own expressed views and at least aspects of mother's account of J.H.'s involvement in A.H.'s life.

Two very brief hearings took place after that, largely confined to scheduling. No mention was made of J.H. at either one.

The subject of J.H. did not arise again until a trial management conference on January 14, 2020, at which *B.M.* (the half-siblings' father) was elevated to the status of A.H.'s presumed father. At that court appearance, counsel for B.M. reminded the court of B.M.'s pending request to be recognized as her presumed father. During the colloquy this precipitated, counsel for B.M. asserted that B.M. had raised A.H. but was not her biological father. The court asked where J.H. was; mother (not under oath) and her counsel made various statements about J.H.'s role in A.H.'s life that were inconsistent with other earlier statements made by mother to the Department[7]; and both the Department and the children's counsel indicated they had no objection to presumed father status for B.M.

The court then inquired about whether J.H. had ever paid child support for A.H., which led to more unanswered questions. In the ensuing colloquy, mother asserted J.H. had started paying child support two years earlier,

---

[7] Specifically, mother asserted, "he hasn't been in her life since she was born." Mother's counsel asserted, "Mother does feel that [B.M.] is the father in this case. He's acted as [A.H.'s] father since she was nine months old."

12

which had been collected through the Department of Child Support Services (DCSS) because, she asserted, "we were on Welfare." She told the court she was no longer on welfare and that, "They're trying to go after me for child support for my kids, so they closed his case." Counsel for the children, who explained the state's practice of collecting child support from parents to pay for the care of a dependent child removed from parental custody, hypothesized that DCSS would no longer collect child support for A.H. from J.H. if it was presently seeking child support for her from mother and B.M., but also indicated it was possible that J.H. was still paying child support. Counsel for the Department then conceded the possibility J.H. was a "legal" parent under the law: she asserted that, "if there's an order for him to pay child support, then there would be an order—there's some kind of paternity order in family law, which would make him a legal father."[8]

That was the extent of the child support discussion, and the court did not direct any further inquiry into the matter. After being assured by counsel there could be more than one presumed father, the court granted B.M.'s request to be elevated to presumed father status as to A.H. The hearing was adjourned shortly after that, without further mention of J.H.

The contested jurisdiction and disposition hearing finally took place about four months later, as noted on May 11, 2020. The Department's most recent addendum report, filed January 31, 2020, continued to recommend J.H. receive no reunification services because he "remains an alleged father" of A.H. Mother, B.M., their counsel, and counsel for the children and the Department were present. J.H., who had not been informed of it, was not.

---

[8] It is not entirely clear but it appears the Department used "legal father" as a shorthand for "biological father" and not necessarily to mean "presumed father." Nonetheless, as we have discussed, biological fathers have greater rights in dependency proceedings than "alleged fathers."

Several witnesses testified, including mother and B.M. As relevant here, B.M. testified that he had lived with the children's mother for six or seven years, that A.H. was with them for that entire time, that he played a parental role in her life, and that he had two children with mother, K.M. and P.M. The sole evidence about *J.H.* was from a dependency investigator, who testified about his whereabouts in response to any inquiry from the court ("you still do not know where he is?"). The investigator testified, "We have not had contact with him." The court then asked, "What have you done to try to contact him?" The investigator replied, "We have an Absent Parent search.· I've attempted to contact him at the number he originally reached out to the ER worker at but have not received any response." No information was requested or provided as to what the "Absent Parent" search consisted of, or what results it yielded, if any; nor does the record contain any other evidence of or information about that search. No inquiry was made of the investigator (or any other witness) about the email address for J.H. the Department had obtained and used at the start of the case, prior to the detention hearing. And no inquiry was made of mother concerning any of these subjects.

At the conclusion of the hearing, the court sustained various jurisdictional allegations including under section 300, subdivision (g) that the whereabouts of J.H. and his ability to provide care for A.H. were "unknown" and that he had not provided care, support or supervision of her for the last year, placing her at substantial risk of serious physical harm or illness. It made dispositional findings supporting the children's continued out-of-home placement in foster care, and ordered family reunification services for mother and B.M.

14

The court also made various findings at the jurisdiction/disposition hearing, and declined to make others, that give us pause. Despite the absence of any proof J.H. had been given notice of the hearing, the court found that "Notice of the date, time, and location of the hearing was given as required by law." The court also declined to make findings (by checking the appropriate boxes) that it had "inquired of the child's parents present at the hearing and other appropriate persons as to the identity *and addresses* of all presumed or alleged parents of the child" (italics added) and also had "informed and advised the . . . biological father [or] . . . alleged father" of various rights (paragraph 13).[9] (The court declined to make similar findings

---

[9] Those rights included: "a. The right of the child and each parent, legal guardian, and Indian custodian to be present and to be represented by counsel at every stage of the proceedings. The court may appoint counsel subject to the court's right to seek reimbursement if an individual is entitled to appointed counsel and the individual is financially unable to retain counsel.

"b.    The right to be informed by the court of the following:
"•    the contents of the petition;
"•     the nature of and possible consequences of juvenile court proceedings;
"•    the reasons for the initial detention and the purpose and scope of the detention hearing if the child is detained;
"•    the right to have a child who is detained immediately returned to the home of the parent, legal guardian, or Indian custodian if the petition is not sustained;
"•    that if the petition is sustained and the child is removed from the care of the parent, legal guardian, or Indian custodian, the time for services will commence on the date the petition is sustained or 60 days from the date of the initial removal, whichever is earlier;
"•    that the time for services will not exceed 12 months for a child aged three years or over at the time of the initial removal; and
"•    that the time for services will not exceed 6 months for a child under the age of three years at the time of the initial removal or for the member of a sibling group that includes such a child if the parent, legal

15

in the disposition order, also entered on May 28, 2020.) The court declined to order the clerk to "provide the notice required by Welf. & Inst. Code, § 316.2 to [¶] (1) alleged parent (*name*) : . . ." , notice that would have required transmission of the JV-505 Statement Regarding Parentage form to J.H. at whatever address(es) the Department had ascertained for him. (§ 316.2, subd. (b).) The court did not order the Department to engage in any further efforts to locate or contact J.H. And in the disposition order, it made a finding that "[t]he county agency has exercised due diligence to identify, locate, and contact the child's relatives." It also found the biological father "does not desire custody of the child," and that "[b]y clear and convincing evidence, placement with the [biological father] would be detrimental to the safety, protection or physical or emotional well-being of the child."

There is no indication in the record that J.H. was advised of these adverse findings against him or of his right to appeal. (See § 395; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150 [right to appeal from disposition ruling].) And the clerk did not serve either order on J.H.

## IV.

### *Reunification Period*

After the jurisdiction/disposition hearing, mother and B.M. received reunification services for another 10 months, until they were terminated on

---

guardian, or Indian custodian fails to participate regularly and make substantive progress in any court-ordered treatment program.

"c.    The right to a hearing by the court on the issues presented by the petition.

"d.    The right to assert the privilege against self-incrimination; to confront and cross-examine the persons who prepared reports or documents submitted to the court by the petitioner and the witnesses called to testify against the parent, legal guardian; or Indian custodian; to subpoena witnesses; and to present evidence on his or her own behalf."

March 21, 2021. Twice during this period, the Department actually spoke with J.H. (to give him notice of incidental matters), but again made no effort to or advise him of his rights as required by section 316.2 or apprise the court of where he was actually residing (or, conversely, explain why the Department was unable to establish and/or maintain contact with him).

The first indication the Department had contacted J.H. was on July 30, 2020, when it filed an ex parte application for an order authorizing dental treatment for A.H. The application indicated it had notified J.H. of this by telephone at a specified telephone number, and also continued to list the address on Walerga Road in Sacramento.[10] The resulting order was served on counsel for the represented parties but not on J.H.

After that, the court twice rescheduled the status review hearing (once at the Department's request), and neither the scheduling orders nor the Department's application, were served on J.H.

Then in December 2020, the Department filed an ex parte application for an order authorizing release of A.H.'s social security number to the foster parents and stated that J.H. had been notified "In Person." It said nothing about where J.H. was served or how the Department had found him. The application again listed the address for J.H. on Walerga Road in Sacramento and a phone number.

Then, in a January 19, 2021 status report for a review hearing scheduled for the same date (which recommended termination of reunification services), the Department provided conflicting information about J.H.'s whereabouts. The report stated, on the one hand, that notice had been given to J.H. by mail on January 15, 2021, but provided no

_____

[10] The Department did not provide any information about whether the telephone number was new nor its source.

17

information about the address at which it had purportedly served him.[11]  It also stated that "*the whereabouts of the alleged father,* [*J.H.*]*, are known to the Department*" (italics added) and that "A JV 140, Notification of Mailing Address with the current whereabouts of the alleged father, will be mailed to [J.H.] and filed separately", and indicated (by checking a box) that  "[t]here are *unresolved* paternity issues."[12]  (Italics added.)  On the other hand, the report stated the social worker "has not been able to contact [J.H.] to get an update on his current circumstances."  The report further stated that A.H. recently informed the social worker "that she would like to speak with her biological father, [J.H.], so she can see how he is doing," but that the social worker was "unable to reach him or leave a message" and that the "last known number" for him was "now no longer in service."  The report stated the Department had sent him an email and would "continue to make efforts to contact [J.H.] to encourage a relationship with [A.H.]."  In addition, contrary to the report's statement that notice had been given by mail to J.H. at an unspecified address, the attached proof of service has a check in the boxes indicating service only for counsel, mother and B.M. but not J.H.

The January 19, 2021 review hearing was attended by mother and B.M., their counsel and counsel for the children but not J.H.  The matter was reset for a contested status review hearing, and then twice continued after that, with no record of any notice to J.H.  The contested review hearing

---

[11]  The report again listed J.H. as A.H.'s alleged father with the address on Walerga Road in Sacramento and a phone number

[12]  The report also confusingly indicated that A.H.'s father's name was J.H., that his status was "presumed," that such a finding was made on January 14, 2020.  But it also stated that "[o]n January 14, 2020, [B.M.] was elevated to Presumed status for [A.H.]," and elsewhere refers to J.H. merely as "the alleged father."  We presume the characterization of J.H. as having been elevated to presumed father status was an inadvertent error.

eventually took place on March 22, 2021, at which time the court terminated reunification services for each child and set a section 366.26 hearing. J.H. was not given notice of this ruling nor of his right to challenge this ruling by writ petition.

## V.

### *Post-Reunification Period and the Termination of Parental Rights*

Six months later, on September 13, 2021, the juvenile court terminated parental rights concerning A.H. of mother, B.M. and J.H.

J.H. was not present at that hearing, and there is no record he was notified of it. According to a sworn proof of service, written notice of the *originally* scheduled date for the section 366.26 hearing (July 20, 2021) was personally served on J.H. (on May 1, 2021, at a new address in Sacramento, on Valley Green Drive, although the text of the written notice itself listed the Walerga Road address for him); but on appeal his counsel questions the proof of service's accuracy because of a discrepancy in the document's physical description of the person served.[13] Regardless, the hearing was twice continued (on July 20, 2021, after mother requested a bonding study, and then on August 10, 2021, after she withdrew her request and asked for a contested evidentiary hearing), and there is no indication J.H. was notified of either rescheduled hearing date, including the September 13, 2021 hearing at which his rights were actually adjudicated. Nor did the Department serve J.H. with its section 366.26 report or with a subsequent addendum report it filed.[14]

---

[13] Counsel for J.H. suggests the notice may have been served on someone else, because the description indicates the person served was "Age: 25" and J.H. at the time was 31.

[14] He also had not been notified that the Department had changed A.H.'s foster care placement in April 2021.

19

In the months preceding the termination of J.H.'s parental rights, the Department had contact with him, but the record contains no explanation as to why he was not served with anything but, at most, written notice of the originally scheduled hearing date. Specifically, according to the July 2, 2021 section 366.26 report, at some unspecified time and under unexplained circumstances, J.H. asked the Department to consider his mother as a potential permanent home for A.H., and, in May 2021, the Department assessed her, determined she was not appropriate and denied a relative placement with her. The record also reflects that by May 12, when the Department filed a notice that it had changed A.H.'s foster care placement, the Department had a new telephone number for him.

Whatever the circumstances, the record is clear that, by this point, J.H. had not been in contact with A.H. The Department reported in an addendum report (filed July 16, 2021) that the foster family agency that had been involved in supervising visitation for A.H.'s half-siblings had "made attempts to set up visitation with alleged father [J.H.], but [J.H.] does not respond to make those arrangements."[15] It also reported that A.H. "has consistently told many of the adults around her, and continues to say, that she believes she is a 'wolf cub' and her parents are dead."

At the September 13, 2021 hearing, the court terminated J.H.'s parental rights after receiving unsworn assurances he had been given notice of unspecified substance about the hearing that date. Specifically, the court asked counsel for the Department whether it had previously terminated the parental rights of J.H., and counsel responded that the Department was asking the court to "do that today." She further informed the court, "[J.H.]

---

[15] No information was provided about the contact information the agency had attempted to utilize.

remains an alleged father. He has been served. He's been in contact with the department. He spoke with Ms. Wagstaff and advised her that he was planning to come to court, but he's not here." The court made various findings including that "notice has been given as required by law," ordered adoption as A.H.'s permanent plan and terminated the parental rights of mother, B.M. and J.H.

The superior court clerk served J.H. with a notice of his appellate rights. He then filed a timely notice of appeal from the court's termination of his parental rights, and we appointed counsel to represent him on appeal.

## DISCUSSION

J.H. argues that the court and the Department violated his right to due process in ways that "infected the entire proceedings as to [him]." As a result, he contends, "his parental rights were terminated without affording him any voice on the matter." First, he contends the Department failed to provide him notice of dependency proceedings, and the court never appointed him counsel despite evidence that he was A.H.'s father. Second, he contends the court failed to conduct its duty to inquire about his address and facts relating to his parentage of A.H. and failed to require the department or the court clerk to provide him notice of the proceedings and the potential termination of his parental rights by certified mail at the address listed for him in the record. Third, he argues the court failed to direct the clerk to provide him notice of any of the hearings or orders, including information about the nature of the hearing and the consequences of failing to attend. Finally, he contends that the Department failed to perform any due diligence to locate him, notify him of hearings and address his parentage status, even though it was aware he had provided support for A.H. pursuant to a court order.

21

The Department concedes there were "noticing errors" but contends it "exercised reasonably due diligent search efforts for J.H.," that when it knew his whereabouts it gave him notice of "key proceedings," and that in any event, "any error was harmless."[16]

## I.

### *The Juvenile Court Violated J.H.'s Statutory and Due Process Rights As an Alleged Father.*[17]

Necessary to protecting the parental rights of an alleged father who does not have custody of a child is that the juvenile court inquire *both* about his existence and his whereabouts, so that he will receive notice of the proceedings as well as notice of his rights. Notice is, of course, the most basic and fundamental of an alleged father's rights, for without it he will be uninformed of his right to participate and thus unable to elevate his status to presumed parent, to be afforded the opportunity to visit with his child, to

---

[16] The Department does not contend J.H. forfeited his contentions of notice errors by failing in the juvenile court to challenge any rulings and/or by failing to file a section 388 petition. And for good reason. Until the court terminated his parental rights, J.H. was not even served with the orders to which he would have objected and/or sought to modify. On the first and only occasion J.H. was notified of a right to appellate review, he filed a notice of appeal from the order terminating his parental rights. This court then appointed him counsel, who raised the notice deficiencies in the opening brief. We have no hesitation considering his appellate arguments on their merits. (See *In re Christopher L.*, *supra*, 56 Cal.App.5th at p. 1183, fn.4 [rejecting forfeiture argument based on father's failure to raise denial of right to counsel and ability to participate in jurisdiction hearing in section 388 motion, exercising discretion to consider issues on appeal].)

[17] By referring to J.H. as an "alleged father," we refer only to the status he was accorded by the juvenile court. We do not mean to suggest that he was not entitled to and would not have established he was A.H.'s presumed father if the Department and the juvenile court had fully and timely complied with their statutory obligations to inquire about and address the issue of his paternity.

22

receive any services needed to reunify and to protect his rights to custody or an ongoing relationship with his child.

In juvenile dependency proceedings, " '[n]otice is both a constitutional and statutory imperative,' " with the constitutional dimension requiring " 'notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend.' " (*Mia M.*, *supra,* 75 Cal.App.5th at p. 807; accord, *In re J.R.* (2022) 82 Cal.App.5th 569, 588 (*J.R.*).) " ' "A parent's fundamental right to adequate notice and the opportunity to be heard in dependency matters involving potential deprivation of the parental interest [citation] has little, if any, value unless that parent is advised of the *nature* of the hearing giving rise to that opportunity, including what will be decided therein. Only with adequate notice can one choose to appear or not, prepare or not, and to defend, or not." [Citation.]' " (*Mia M.,* at p. 807.)

Here, the juvenile court failed at multiple junctures and in multiple ways to afford proper notice to J.H. of these proceedings and his rights as an alleged father as required by law. The court violated both his statutory rights and, ultimately, his due process rights, and this cumulatively resulted in a process that was fundamentally unfair.

### 1. Duty to Determine Parentage

To begin, juvenile courts have a duty to determine a child's parentage at the earliest opportunity, imposed both by statute and under the Rules of Court.

Section 316.2 states that "[a]*t the detention hearing, or as soon thereafter as practicable*, the court shall inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers" and, further, requires the court to ask very specific questions concerning that subject. (§ 316.2, subd. (a).) It states that "The inquiry shall

23

include at least all of the following, as the court deems appropriate: [¶] (1) Whether a judgment of paternity already exists. [¶] (2) Whether the mother was married or believed she was married at the time of conception of the child or at any time thereafter. [¶] (3) Whether the mother was cohabiting with a man at the time of conception or birth of the child. [¶] (4) Whether the mother has received support payments or promises of support with respect to the child or in connection with her pregnancy. [¶] (5) Whether any man has formally or informally acknowledged or declared his possible paternity of the child, including by signing a voluntary declaration of paternity. [¶] (6) Whether paternity tests have been administered and the results, if any. [¶] (7) Whether any man otherwise qualifies as a presumed father pursuant to Section 7611, or any other provision, of the Family Code." (*Ibid.*)

The Rules of Court go even further. Rule 5.635 imposes a *continuing* duty on the juvenile court to inquire about parentage *at every hearing* from the very beginning of a dependency case until the question of parentage has been resolved; it specifies steps the court must take to address the issue of parentage with every person present at each hearing *and* with local child support authorities; and, if there has been no prior determination of parentage, it requires the court to make such a determination.[18] (See Cal. Rules of Court, rule 5.635.)

---

[18] Specifically, rule 5.635 in relevant part requires the court to inquire about "the identity and address of any and all presumed or alleged parents of the child" "[a]t the initial hearing on a petition filed under section 300 . . . and at hearings thereafter until or unless parentage has been established." (Cal. Rules of Court, rule 5.635(b).) The inquiry must be made to "the child's parents present at the hearing and of any other appropriate person present," and the rule specifies various questions the court may ask, in its discretion, "that may provide information regarding parentage." (*Ibid.*) The rule also provides that "[i]f, at any proceeding regarding the child, the issue of parentage is addressed by the court," the court must: (1) ask any person

In this case, the juvenile court all but ignored its duty to inquire about J.H.'s possible legal paternity. The only inquiry the court made about paternity at the detention hearing was to ask whether, besides J.H. (who it acknowledged "appears to be an alleged father as to [A.H.]"), there was "anybody else around" who might come forward and claim paternity of any of the children. It asked nothing about J.H., his relationship with A.H., facts that might indicate he was a presumed father, or of the Department's efforts to ascertain his whereabouts. In addition, at subsequent hearings although occasionally it inquired about the Department's efforts to *locate* J.H., only once did it ever inquire about J.H.'s possible paternity (at the case management hearing on January 14, 2020, held several months before the contested jurisdiction/disposition hearing). And even then, the court's questions were quite limited. Not once did it ever ask mother (or anyone else for that matter, such as counsel) whether there had been any prior

present at the hearing "whether any parentage finding has been made, and, if so, what court made it, or whether a voluntary declaration has been executed and filed under the Family Code"; and (2) "direct the court clerk to prepare and transmit *Parentage Inquiry–Juvenile* (form JV-500) to the local child support agency requesting an inquiry regarding whether parentage has been established through any superior court order or judgment or through the execution and filing of a voluntary declaration under the Family Code." (*Id.*, rule 5.635(d)(1), (2).) If the local child support agency provides any order or judgment of parentage or voluntary declaration of parentage, the juvenile court "must take judicial notice of the prior determination of parentage." (*Id.*, rule 5.635(d)(4).) The rule also directs that "[i]f the local child support agency states, or if the court determines through statements of the parties or other evidence, that there has been no prior determination of parentage of the child, the juvenile court must take appropriate steps to make such a determination," and goes on to specify how such a determination may be made, including through an alleged father's submission of a *Statement Regarding Parentage (Juvenile)* (form JV-505) which we discuss *post*, the use of genetic testing, as well as "based on the testimony, declarations, or statements of the alleged parents." (*Id.*, rule 5.635(e)).

25

declaration or determination of paternity or genetic test results or whether mother and J.H. had been cohabiting at the time of A.H.'s conception or birth (see § 316.2, subd. (a); Cal. Rules of Court, rule 5.635(d).) Not even after the Department disclosed in a report (in November 2019) that mother said J.H. is A.H.'s biological father, or during the reunification phase when the Department told the court (in a January 2021 report) "[t]here are unresolved paternity issues." Likewise, it did not ever direct the clerk to contact the local child support agency (Cal. Rules of Court, rule 5.635(d)(2))—not even *after* the Department disclosed the existence of a default judgment for child support in the November 15, 2019 jurisdiction/disposition report, nor after mother told the court at the January 14, 2020 case management hearing that took place months before the jurisdiction/disposition hearing that J.H. had paid child support in the past and counsel for the Department conceded that the existence of a child support order would likely mean there *had* been a paternity determination, "which would make him a legal father."

### 2. Alleged Parent's Statutory Right to Notice of the Proceedings and to Be Advised of His Rights to Establish Paternity

Quite apart from the court's independent duty of inquiry, an alleged father is entitled at the earliest possible point to be informed of the importance of, and apprised of the statutory method for, seeking presumed parent status.

Specifically, section 316.2 requires the court to give to all men who are identified as an alleged father a statutorily prescribed notice and a statutorily prescribed form containing various advisements that enables them to exercise their rights as an alleged father to assert a claim to parentage. This procedure mandated by section 316.2 is the statutory means of protecting an alleged father's limited due process to notice and an

26

opportunity to appear in the case to assert a position and attempt to change his paternity status. (*In re Paul H.* (2003) 111 Cal.App.4th 753, 760.)

In relevant part, subdivision (b) states: "If, after the court inquiry, one or more men are identified as an alleged father, each alleged father shall be provided notice *at his last and usual place of abode by certified mail return receipt requested* alleging that he is or could be the father of the child. *The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. Judicial Council form Paternity–Waiver of Rights (JV 505) shall be included with the notice.*" (Italics added; see also Cal. Rules of Court, rule 5.635(g); *In re Daniel F.* (2021) 64 Cal.App.5th 701, 714 (*Daniel F.*) ["diligent efforts to locate and serve notice and form JV-505 on alleged fathers must likewise occur from the earliest stages of the proceedings"].)

"Form JV-505 explains that an alleged parent will not receive reunification services and will not 'automatically get the child to live with you or your relatives.' [Citations.] Further, the form provides notice that if the alleged parent wants the court to decide if he is the minor's parent, he should fill out form JV-505, and it provides options to request that the court make a determination concerning parentage. [Citations.]" (*J.W.-P.*, *supra,* 54 Cal.App.5th 298, 306.) The form notifies the alleged father of his rights to a trial to establish parentage and to free counsel if he cannot afford a lawyer. It provides boxes to check and spaces for writing that enable the alleged father easily to: request counsel; and inform the court if he has already established parentage by voluntary declaration or judgment. "California Rules of Court, rule 5.635(h), in turn provides that '[i]f a person appears at a hearing in [a] dependency matter . . . and requests a judgment of parentage

27

on form JV-505, the court must determine' whether an alleged parent should be elevated to a higher status—either a biological parent or presumed parent." (*J.W.-P.*, at p. 306.)

Our colleagues in Division 5 discussed the due process aspect of the juvenile court's obligations under section 316.2. (*J.W.-P.*, *supra*, 54 Cal.App.5th at pp. 306-307.) " 'Section 316.2 is designed to protect the alleged father's limited due process rights.' [Citations.] The notice required in section 316.2 provides an alleged father with critical information about an alleged parent's limited rights and explains the procedure he must follow to establish his paternity status: complete form JV-505. The court's '[f]ailure to provide the statutory notice denie[s]' an alleged father 'adequate notice of his rights and the ability to access the procedure for establishing paternity, obtaining reunification services and ultimately seeking placement of his [child] in his home or with one of his relatives.' [Citations.]" (*Id.* at p. 306.)

The Department failed to comply with either of the requirements of section 316.2, subdivision (b), and on appeal it concedes these errors. Despite the petition's allegation of J.H.'s alleged father status and the record suggesting he might well be eligible to attain presumed father status, the Department sent no paternity notice or form JV-505 to J.H., or even attempted to send them or otherwise to communicate with him about his parentage and how to establish it. Despite several opportunities—including a telephone call with J.H. three weeks after the case began; another conversation with him much later on about the suitability of assessing his mother as potential permanent placement; access to an email address for him; and even one purported attempt at personal service of other documents—it appears never to have occurred to the Department to do whatever it could at least to substantially comply with the statute, even if at

28

various junctures it did not have a reliable mailing address for J.H. (a fact that is not at all apparent from the record, which raises more questions than it answers).

Nor did the juvenile court ensure that J.H. was provided this critical notice and parentage form as quickly as possible, and by whatever means were reasonably practicable if indeed his actual address could not be determined. Neither at the detention hearing nor thereafter did it ever inquire whether the Department had sent the JV-500 form to J.H. or direct the clerk of court to do so. Nor, as we have discussed, did it ask any of the many questions it should have asked under section 316.2 and Rule of Court, rule 5.635.

The importance of this step cannot be overstated. Without it, there was simply no assurance of protecting J.H.'s right to participate in the proceedings if indeed he was A.H.'s biological father (as mother would later reveal) or had a basis to demonstrate presumed father status. (See *Daniel F.*, *supra*, 64 Cal.App.5th at p. 714 [agency's "failure to provide [alleged father] with the statutorily required materials [under section 316.2] denied him adequate notice of his rights and the ability to access procedures for establishing paternity and obtaining reunification services"].) Even in cases where alleged fathers have actually appeared in a dependency case, appellate courts have reversed orders entered late in the dependency case—including orders terminating parental rights—for the juvenile court's failure to give an alleged father the statutorily required notice and form under section 316.2. (See *J.W.-P.*, *supra,* 54 Cal.App.5th at pp. 306-308 [vacating orders establishing permanent plan of guardianship and dismissing the dependency, even though alleged father had been represented by counsel; "[t]he notice provided by section 316.2 is a failsafe mechanism that would have told father

directly the steps he himself could take—without relying on an attorney—to establish his paternity status and protect his rights.  It could have made all the difference to father in this case"]; *In re Paul H.*, *supra,* 111 Cal.App.4th 753, 761, 762 [reversing order terminating parental rights of alleged father who had appeared and made "extensive" but unsuccessful attempts to obtain paternity testing, without assistance of social services agency or appointed counsel].)

### 3. Alleged Parent's Statutory Right to Notice of Specific Hearings

By statute, an alleged father also is entitled to notice of the proceedings and certain hearings.  Upon a social worker's determination to detain a child or upon the filing of a dependency petition, notice of *the initial petition hearing* (including its time, date and place and a copy of the petition) shall be given to an alleged father if his whereabouts are known.  (See §§ 290.1, subds. (a)(2), (d); 290.2, subds. (a)(2), (d).)  An alleged father also is statutorily entitled to notice of the jurisdiction and disposition hearings, accompanied by an advisement of various rights and a copy of the petition.[19]

---

[19] Specifically, after the initial petition hearing, and as soon as possible after a child has been detained, an alleged father must be given notice of the jurisdictional hearing that specifies the nature of the hearing, identifies the sections and subdivisions under which the proceeding was initiated, states the date, time and place of the hearing, the name of the child on whose behalf the petition was brought and explains that if the person fails to appear, the court may proceed without him.  (§ 291, subds. (a), (c), (d).)  The notice must also inform the alleged father that he is entitled to have an attorney present at the hearing and if he is indigent and desires counsel, he should promptly notify the court clerk.  (*Id.*, subd. (d)(6)(B), (C).)  The notice must include a copy of the petition, and if the child is detained and the alleged father was not present at the initial petition hearing, must be served by personal service or certified mail, return receipt requested.  (*Id.*, subds. (d)(7), (e)(1).)

(See § 291, subds. (a)(2), (d), (e)(1); *In re Jennifer O.* (2010) 184 Cal.App.4th 539, 546 ["If parents were not present at the detention hearing, they must be personally served with a copy of the petition and notice of the jurisdictional and dispositional hearings served by certified mail, return receipt requested." (§ 291, subd. (e)(1).)"].)  And an alleged father is statutorily entitled to notice of the section 366.26 hearing (unless he has denied paternity and executed a waiver of the right to notice of further proceedings) (see § 294, subds. (a)(2), (b)(2)) but not periodic review hearings unless he is receiving services (see § 293, subd. (a)(2)).  There are statutorily prescribed methods for serving notice of the section 366.26 hearing, including when a parent's whereabouts are unknown (see § 294, subd. (f)), and the notice must conform to statutorily prescribed contents (see § 294, subd. (e).)

Here, J.H. received notice of none of these hearings by means of the statutorily prescribed methods.  The record reflects no notice to him of the initial hearing (i.e., the detention hearing), even though the petition listed an address for him (although it also alleged his whereabouts were unknown).  (See § 290.2, subd. (a) [notice of initial hearing required to be given to, inter alia, alleged father if "address is known or becomes known prior to the initial petition hearing"].)  Had he been given such notice, as mother and B.M. were, he would have been advised of the rights to be present at the hearing, to present evidence and to have court-appointed counsel if unable to afford an attorney; and would have been provided with a telephone number to contact the social worker with any questions.  The Department also concedes he was not given statutorily required notice of the jurisdiction/disposition hearing.[20]

---

[20] The Department does point out that the ICWA notice apprised J.H. of the date, time and location of the jurisdiction and disposition hearing.  But it rightly does not argue the ICWA notice satisfied all of the statutory notice requirements pertaining to the jurisdiction hearing, or even substantially

And the record does not reflect he was given notice of the section 366.26 hearing either.

### 4. Due Process Requirement of a Diligent Search to Locate an Alleged Parent

Because a parent is constitutionally entitled to " 'notice that is reasonably calculated to apprise him or her of the dependency proceedings and afford him or her an opportunity to object' " (*In re R.A.*, *supra*, 61 Cal.App.5th 826, 835), the state has a constitutional duty to exercise reasonable diligence to locate an alleged father if his whereabouts are unknown, so that he may be given proper notice. (See *Mia M.*, *supra*, 75 Cal.App.5th at pp. 807-810; *Daniel F.*, *supra*, 64 Cal.App.5th 701, 711-716 [error to deny evidentiary hearing as to whether due diligence was exercised to locate alleged father].) Despite its serious and admitted lapses in notice, the Department contends it "conducted a thorough search for J.H. despite being given very little information by C.S., or anyone else." To begin with, we question its premise that, at least for a time early on, J.H.'s whereabouts were unknown such that it could not have him given notice under section 316.2 of his rights to participate in the case, *because the Department spoke with him three weeks after the detention hearing*. At that point, his whereabouts *were* known (or, at least, they were quite readily ascertainable—

complied with them. Of course, it didn't. For example, the ICWA notice didn't advise him of the hearing's purpose or his right to representation by counsel, including potentially appointed counsel (see footnote 20, *ante*, page 31). Furthermore, the record is devoid of evidence that the Department ever attempted to inform J.H. of the many continuances of the jurisdiction and disposition hearing which eventually was conducted in May 2020. He thus never received notice of the actual date on which the contested jurisdiction and disposition hearing was held. Thus, the Department's concession that it failed to give J.H. proper notice of the jurisdiction hearing is entirely well-taken.

from the most reliable source of all: J.H. himself). But even leaving that aside, the record does not show the Department conducted a constitutionally adequate search for him.

" '[T]here is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for a majority of the proceedings.' " (*In re R.A.*, *supra,* 61 Cal.App.5th at pp. 835-836.) But as our colleagues in Division Three recently opined in *Daniel F.*, " '[s]ocial services agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned.' [Citation.]" (*Daniel F.*, *supra,* 64 Cal.App.5th at pp. 711-712.) They explained, moreover, what this entails: "[R]easonable diligence 'denotes a thorough, systematic investigation and an inquiry conducted in good faith.' [Citation.] It includes searching not only 'standard avenues available to help locate a missing parent,' but ' "specific ones most likely, under the unique facts known to the [Agency], to yield [a parent's] address." ' ([*In re*] *D.R.* [(2019)] 39 Cal.App.5th [583,] 591 [(*D.R.*)], citing *In re Arlyne A.* (2000) 85 Cal.App.4th 591, 599 [agency failed to search 'most likely' avenues, e.g., calling directory assistance of city where parents reportedly lived and obtaining police report that showed where father worked]; see also *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 481 (*Ansley*) [no evidence in record that agency attempted to serve father with notice of proceedings].) Thus, in *D.R.*, the court found a violation of due process where the child welfare services agency 'searched almost two dozen United States government databases, well aware Father had been deported to Mexico,' but ignored the 'most likely means of being able to actually identify Father and

33

gain his contact information to notify him,' such as asking for help from his children who were in contact with him through social media. (*D.R.*, *supra*, 39 Cal.App.5th at pp. 591–592.)" (*Daniel F.*, at p. 712; see also *J.R., supra*, 82 Cal.App.5th at pp. 587-591.)

Here, the Department did not report it knew J.H.'s whereabouts until January 2021, about eight months after the jurisdiction/disposition hearing and two months before the court terminated mother's reunification services and set a section 366.26 hearing. Even then, of course, as discussed, the record does not show the Department gave him notice under section 316.2 of his rights, nor afterwards did it give him notice of the section 366.26 hearing. Equally problematic, the record is inadequate to support a finding the Department exercised reasonable diligence to locate J.H., either before that juncture or after.

The only record of the Department's efforts to find J.H. during the entire two years of proceedings was testimony by the Department's investigator at the May 11, 2020 jurisdiction/disposition hearing, held about eight months into the case, about his attempt to contact J.H. using "the number he originally reached out to the ER worker at" and that "[w]e have an Absent Parent search." There was no information about what the absent parent search encompassed, or even whether it had been completed or was merely underway.

That vague testimony, such as it was, by no means supports a finding the Department had done all that it reasonably could have done to find J.H. before then, or that it did so afterwards. Nowhere in the record is there any description of any search the Department conducted for J.H. There is no evidence that it searched any databases or other sources to obtain information about his whereabouts. It identified three different addresses for

34

him in its various reports but the record contains no information about where or how it obtained these addresses, whether it confirmed any of them with J.H. and whether they were residence addresses or mailing addresses. There is not even any evidence that it asked mother where to find him, or where to find any of his relatives who might know where he was (such as his mother).

Most remarkably, *there is no evidence that in any of the handful of telephone calls it made to or received from J.H.—including the October 8, 2019 phone call with him three weeks after the detention hearing— the Department inquired of him where he was living, or how he could reliably be reached.* (See, e.g., *J.R., supra*, 82 Cal.App.5th at p. 590.) There also is no evidence the Department ever provided him the JV-140 form that advises an alleged parent to provide a permanent mailing address and notify the Department of any changes. The fact that the telephone numbers it obtained were repeatedly disconnected or out of service suggested J.H. may have had limited resources and that determining how to reach him should have been a higher priority. Yet, although it apparently obtained an email address for him early in the case, there is no evidence it ever sent him by email the notices required by sections 291 and 316.2. On this record, there are just as many unanswered questions about J.H.'s actual living situation as there are about the Department's efforts to ascertain them; we cannot tell whether J.H. had a stable home at any juncture, whether he moved frequently or whether he was homeless or transient.

The record of the Department's efforts to find J.H. is practically non-existent. It is even thinner (by far) than in other cases where the record of search efforts to find an absent parent have been held insufficient. The documented record of the Department's search efforts does not show that it complied with due process. (See *Mia M., supra*, 75 Cal.App.5th at pp. 807-

35

810 [concluding record was "woefully inadequate" to support a finding agency exercised reasonable diligence to locate alleged father despite having interviewed mother and the minor, including because agency "failed to investigate the most likely avenues for locating father"]; *Daniel F.*, *supra*, 64 Cal.App.5th at pp. 713-714 [questioning agency's efforts, particularly in light of its early contact with alleged father's sister a few weeks after jurisdiction/disposition hearing with no indication it asked her about his whereabouts until six months later]; see also *J.R., supra*, 82 Cal.App.5th at pp. 587-591 [constitutionally inadequate search to find mother].)

In sum, from the outset of the dependency proceedings through the jurisdiction and dispositional hearing, the Department's efforts to locate J.H. and provide him notice requirements fell far short of the statutory requirements and left him in the dark about his parental status, how to assert his parental rights and how to participate in the proceedings. The record refutes its contention that it conducted a reasonable, systematic or thorough search for him or any engaged in any consistent effort to provide him notice. While its efforts may have improved later in the case (as evidenced by its report asserting his whereabouts were now known to it), the Department never rectified its earlier failures by advising J.H. of his right to request counsel and his need to elevate his status to presumed parent to assert his parental rights.

Because J.H. was deprived of critical information about his rights and ability to participate in the dependency proceeding, the Department violated his right to due process.

## II.

### *The Errors Are Prejudicial.*

The Department contends the defects in notice in this case were harmless. However, it does not address the harmless error standard that applies, instead conflating the state law *Watson* standard of whether there was a reasonable probability of a different outcome with the more stringent federal harmless-beyond-a-reasonable-doubt standard under *Chapman.*

J.H. argues we should treat the errors here as structural, applying our Supreme Court's analysis in *Christopher L., supra,* 12 Cal.5th 1063.

We need not decide whether the error is structural under *Christopher L.* or resolve the question of which prejudice standard applies— an issue on which the appellate courts are divided (compare *J.R., supra,* 82 Cal.App.5th at p. 591; *Mia M., supra,* 75 Cal.App.5th at p. 806; *In re Marcos G.* (2010) 182 Cal.App.4th 369, 387; *In re J.H.* (2007) 158 Cal.App.4th 174, 183-184; and *In re Justice P.* (2004) 123 Cal.App.4th 181, 193, applying *Chapman* standard, with *In re A.J.* (2019) 44 Cal.App.5th 652, 665-666; *Daniel F., supra,* 64 Cal.App.5th 701, 716, applying *Watson* standard) and which our Supreme Court has left open. (*Christopher L., supra,* 12 Cal.5th at pp. 1076, 1083.) Under either standard, the statutory errors and due process violations here were so systemic that we cannot conclude they were harmless.

To demonstrate prejudice, the record does not need to show that an alleged father would be elevated to presumed father status, "*because a biological father may get services if doing so is in the child's best interest.* (§ 361.5, subd. (a).) . . . Further, such a man may take the child into his home to establish presumed father status." (*In re O.S., supra,* 102 Cal.App.4th 1402, 1411.) Here, at a minimum, it is reasonably probable that had J.H. been located sooner and advised of his rights as an alleged father, he would

37

have stepped forward, obtained counsel and demonstrated a basis to obtain services as at least a biological father.

Further, there were significant indicia that he met other factors relevant to the presumed parent determination. For one, barely two months into the case, in November 2019 (and long before the jurisdiction/disposition hearing), the Department was reporting that A.H. regards J.H. as her daddy and that she missed him every day. Mother stated that when J.H. left three years earlier, A.H. had been so upset that she began wetting the bed and blamed B.M. for his leaving. These statements by mother and A.H. contribute to the likelihood of J.H.'s being able to show he received A.H. into his home and established a parental relationship with her. In addition, J.H. has shown he was listed on A.H.'s birth certificate, which is prima facie evidence that he completed a voluntary declaration of paternity. If not rebutted, this, at minimum, trumped B.M.'s presumed father status (see *In re Levi. H.* (2011) 197 Cal.App.4th 1279, 1288-1289 [voluntary declaration of paternity rebuts presumption of paternity under section 7611])[21] and alone, or at least in combination with other factors, entitles him to presumed father status. (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 163); *In re Liam L.*

[21] The Department engages in a lengthy factual analysis to support its position that it would not be detrimental to A.H. not to award *third* presumed parent status to J.H. (see Fam. Code, § 7612, subd. (c)). We disagree. If the Department does not rebut J.H.'s showing that he signed a voluntary declaration, B.M.'s elevation to presumed father will have been improper and cannot prevent father from becoming A.H.'s presumed parent. Moreover, even if that were not the case, J.H. was precluded from—and is now entitled to—an attempt to show it *would* be detrimental to A.H., i.e., that there was "an 'existing, rather than potential, relationship between [J.H.] and [A.H.], such that "recognizing only two parents would be detrimental to the child" ' " (*M.M. v. D.V.*, *supra*, 66 Cal.App.5th 733, 746), and there was certainly evidence of that in this case. In any event, we will not prejudge the issue.

(2000) 84 Cal.App.4th 739, 745-747; *In re Raphael P.* (2002) 97 Cal.App.4th 716, 738; Cal. Code Regs., tit. 22, § 35108, subd. (e)(3); but see *In re Jovanni B.* (2013) 221 Cal.App.4th 1482, 1490-1494.) Another factor that, while not dispositive, weighs in J.H.'s favor is that he paid child support for A.H.

Finally, with regard to the question of presumptive parenthood, we are confident the record is *incomplete* given the nature of all of the collective errors involved here—not just all the notice violations and the violation of J.H.'s rights under section 316.2, but also the juvenile court's violation of its own independent duty to inquire into J.H.'s possible parentage. Thus, like other appellate courts before us in similar circumstances, we decline to deem these errors harmless when the poor state of the record is the result of the very errors themselves. (See *In re Paul H.*, *supra,* 111 Cal.App.4th at p. 762 ["We cannot assume, based on this dearth of information, that had appellant established his paternity and been appointed counsel, he would not have received reunification services. [Citations.] Consequently, we conclude appellant was prejudiced by the juvenile court's failure to follow the procedures contained in section 316.2, subdivision (b), and rule 1413"]; accord, *Daniel F.*, *supra,* 64 Cal.App.5th at p. 716; *Mia M.*, *supra,* 75 Cal.App.5th at p. 813 [rejecting argument that father's lack of involvement in case since learning of the proceedings rendered error in exercising diligence to find him harmless; "considered against the absence of any documentary evidence showing that the Department timely provided father a copy of the petition or required notices about how to assert paternity and request appointment of counsel, we find prejudicial error"].)

Nor do the Department's arguments persuade us that the deficiencies it attributes to J.H.—his failure to attend hearings, to seek visitation, to seek a determination of his status as a presumed father—mean the juvenile court

would not have granted him presumed father status "under any standard." The evidence in favor of him being A.H.'s presumed father was substantial, and if the Department had inquired of him, it could well have learned that he was present and participated in raising her for a significant part or even all, of her life. When mother moved on to B.M. as her romantic partner and he moved into the home, J.H. did not lose his parental rights simply because he moved out of the family home. The question is whether he established a parent-child relationship with A.H. and was committed to his parental responsibilities. Moreover, while the Department asserts that J.H.'s failure to contest the child support proceeding brought against him when mother was receiving public assistance shows a lack of interest in his child, it is equally possible that he did not contest it because he accepted parental responsibility for A.H. and saw no purpose in denying it even if he had known how to do so. Of course, there is no indication in the record that the Department asked any questions of J.H. that were relevant to parentage or sought to determine his status. Hence, there is no basis to assess whether J.H. would have been elevated to presumed father status had he been provided the means to do so. The Department's selective use of information provided by mother (and in some instances also contradicted by her)—information J.H. had no opportunity to rebut—is not only speculative but unreliable and unfair.

On the other hand, we do not agree with J.H. that he was entitled to presumed father status based on the record in this case. But we do not agree with the Department that it is not reasonably probable, much less beyond a reasonable doubt, that if the court and the Department had fulfilled their obligations J.H. would not have been elevated to presumed father status, provided counsel and successfully advocated for either custody or an ongoing

40

beneficial relationship with A.H.  In short, because of the errors the record is sparse, and we will not speculate about what the outcome would have been had J.H. been afforded the information, notice and opportunity to participate that he was entitled, as an alleged father and possible presumed father, to receive.

### III.

### *Conclusion*

The errors in this case, as we have explained, were frequent and numerous.  All were serious, and none we condone.  We are not insensitive to the challenges posed by a parent's itinerancy, indigence or homelessness (if, indeed, those were factors here).  But the state is entrusted with a grave responsibility when it seeks to adjudge a child and her possible parent legal strangers to each other, and no matter how difficult it may be to fulfill the task of providing constitutionally adequate notice to the child's possible parent, it must be undertaken with a level of care befitting its seriousness. That was not done here.

On this record, moreover, it bears noting that the error that most infected the course of this case is the failure to make any attempt to supply the notice to J.H. required by section 316.2 and the required form JV-505, which would have apprised him of the significance of the case, his right to *attempt* to prevent the court from severing all legal ties between him and the child he claims as his daughter, and the steps he needed to take to pursue that course, including with the benefit of counsel if he could not afford one. What is perhaps most troubling about this case is that the court countenanced this lapse despite evidence in the detention report filed the same day this case began that would support a bid for presumed parentage status; admitted phone contact with J.H. three weeks after the detention

41

hearing; and evidence, no less, in a report filed two months after the detention hearing (and six months before the combined jurisdiction and disposition hearing) that the child regards him as her father. Equally troubling, the juvenile court continued to countenance this lapse even after (a) the Department stated in various filings during the reunification phase that it had spoken with J.H. two more times (once by phone about A.H.'s need for dental work (in July 2020) and then *in person* about her social security number (in December 2020)), and then (b) reported (in January 2021, still during the reunification phase) that J.H.'s whereabouts were *known* and the child missed him and wanted to have contact with him.

The impact of that notice error was, of course, related to and, inevitably compounded the impact of, all the others. As we have explained, the juvenile court passed up numerous opportunities to proactively require a more forceful search for J.H.'s whereabouts, as it was statutorily *and* constitutionally required to do, and numerous opportunities to require a thorough investigation into his possible parentage, including to ascertain, with or without him, complete information about whether there had been prior determinations of his paternity.

## DISPOSITION

The order of the juvenile court terminating J.H.'s parental rights is vacated and the matter is remanded to the juvenile court to comply with the provisions set forth in section 316.2 and Rule of Court, rule 5.635 and to determine whether J.H. is A.H.'s presumed parent if he so requests. Our decision is without prejudice to J.H. filing an appropriate motion(s) pursuant to section 388 on remand to challenge any additional orders and/or findings previously entered against him, including but not limited to the jurisdictional findings and orders, dispositional findings and orders, and prior

42

determinations of parentage.  In view of the errors earlier in the case with respect to J.H., the juvenile court should appoint counsel to represent him in any such proceedings.

_____

STEWART, J., Acting P.J.

We concur.


_____

MILLER, J.


_____

MAYFIELD, J. *


*In re A.H.* (A163882)

* Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43

Trial Court:  Solano County Superior Court

Trial Judge:  Hon. D. Scott Daniels

Counsel:

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Bernadette S. Curry, County Counsel, Carrie Scarlata, Assistant County Counsel, Clarisa Sudarma, Deputy County Counsel, for Plaintiff and Respondent.